**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

IN THE MATTER OF THE APPLICATION       :       CASE NO. _____
OF THE UNITED STATES OF AMERICA        :
FOR A SEARCH WARRANT FOR A             :
RED VOLVO STATION WAGON, BEARING       :
VIRGINIA LICENSE PLATES VVD-2593       :
AND VIN #YV1LW5559T2205235             :

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

I, Michael Brown, being duly sworn, states as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since September 2011.   I am currently assigned to the Violent Crimes Task Force Squad CR-2 which focuses on the Washington, D.C. metropolitan area.  I have investigated violent crimes since approximately 2016.   As part of my duties, I have investigated bank robberies, carjackings, kidnappings, fugitive cases, and other crimes of violence.

2.      This affidavit is submitted in support of a warrant to search a red Volvo station wagon, bearing Virginia license plates VVD-2593 and VIN #YV1LW5559T2205235, more fully described in attachment A.  This vehicle is currently in the custody of the Federal Bureau of Investigation, located at 2800 V Street N.E. Washington, D.C.  As described in further detail below, this vehicle was impounded by the FBI following the defendant's arrest on July 7, 2017. The warrant seeks to obtain further evidence that a male suspect and/or others, committed bank robbery in violation of 18 U.S.C. § 2113.  *See* Attachment B.

3.      The facts and information contained in this affidavit are based upon my training and experience, participation in investigations, personal knowledge and observations during the course of this investigation, as well as the observations of other agents and police officers involved in this investigation.  All observations not personally made by me were relayed to me by the

1

individuals who made them or are based on my review of records, documents and other physical evidence obtained during the course of this investigation. This affidavit contains information necessary to support probable cause. It is not intended to include each and every fact and matter observed by me or known to the United States.

4.      Based on my experience and training, I am aware that:

a.      Those involved in criminal activities commonly maintain at their residences, vehicles, and on their property, tools and other implements they used during or in furtherance of the commission of crime.

b.      Those involved in criminal activities commonly maintain at their residences, vehicles, and on their property, books, records, receipts, computer diskettes, computers, notes, ledgers, airline tickets, money orders, and other papers and electronic records relating to their criminal activities.

c.      Those involved in criminal activities commonly maintain books, papers, documents, and electronic records in secure locations within their residences, vehicles, and on their property, so they can have ready access to such information.

d.      Those involved in criminal activities attempt to legitimize the proceeds from their criminal activities. They often accomplish this by using the services of foreign and domestic banks and various financial institutions, and real estate brokers. Books and papers relating to such efforts, including but not limited to, cashier checks, money orders, telegrams, letters of credit and ledgers, are maintained in the residences, vehicles, and on the property of those involved in criminal activities.

e.      Those involved in criminal activities take, or cause to be taken, photographs of themselves, their associates, property derived from their criminal activities, and their products,

including with cellular telephones, and that such photographs are often kept in their residences or vehicles or stored in electronic format on computers, computer thumb drives, or on cellphones.

   f. Those involved in criminal activities very often place assets, including real and personal property, such as vehicles, in names other than their own to avoid the detection and forfeiture of such assets by government agencies and continue to use these assets and to exercise dominion and control over them even though the assets are normally owned by them.

   g. Those involved in criminal activities usually have in their possession weapons.  These weapons often consist of knives, guns, rifles, pistols, revolvers, shotguns, assault-type weapons, and other firearms as well as ammunition for any handgun, shotgun, and/or rifles.  They possess these items for protection against robbery and also for use during and in furtherance of the commission of criminal offenses.

   5. Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

   a. "Computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."  See 18 U.S.C. § 1030(e)(1).

   b. "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices);

3

peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

c.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

d.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

## BACKGROUND OF INVESTIGATION

6.      On July 5, 2017, at approximately 9:45 a.m., a robbery occurred at the TD Bank located at 905 Rhode Island Avenue, N.E., Washington, D.C.  The TD Bank's deposits are federally insured.  Two tellers working at the bank indicated that a suspect entered the bank at that time and approached them.  The suspect handed two notes, one to each teller, and said, effectively, "Give me all the money or I'll kill everyone in here"  The two bank tellers gave the suspect a total

4

of $5,121.00 in U.S. currency which included two packs of "bait money." This is money equipped with a small GPS tracking device.  Upon receiving the money, the suspect walked at a quick pace out of the bank and towards the parking lot.  The suspect then got into an unidentified vehicle and fled the scene.  The suspect, who is depicted in bank surveillance video, is described as a black male, approximately 5' 8" tall, slender build, wearing dark pants, dark shirt, sunglasses, light grey shoes with a white  soles, a hat with a picture of a white scull on the front, and a wrist watch. Further, the suspect appears to be in his 40s and was a carrying a black Under Armour bag.

7.      The two GPS devices from the TD Bank that were provided to the suspect on July 5, 2017, became active once the tellers handed them to the bank robber.  They were tracked moving together from the bank's location at 905 Rhode Island Avenue, N.E. to a location near 62nd Street, N.E.  The devices then separated, indicating that suspect may have an unidentified accomplice. One of the GPSs moved at a slow rate of speed off the roadway to where it was finally recovered near 308 63rd Street, N.E., Washington, D.C. in a black plastic bag with money.  The other GPS device, the one that continued traveling at a high rate of speed on the roadway, indicated that it was at 405 60th Street, N.E., Washington, D.C.  The last "ping" from that GPS device at that location was at approximately 10:17 a.m. on July 5, 2017.  The GPS device is, in my experience, generally accurate to within ten feet when the device indicates that it is stationary.  Furthermore, this GPS device was later discovered in a storm drain outside the 405 60th Street N.E. Washington, D.C. residence.  FBI agents followed the pings from the GPS device to 405 60th Street N.E. Washington, D.C., where they conducted surveillance on the residence.  During that time, FBI agents observed a black male who was in his 60s walking around the 405 60th Street N.E. Washington, D.C. address.  Law enforcement observed this individual talking to other occupants of the house, including the suspect.  Then at approximately 10:31 a.m., he walked to the storm

5

drain near the residence and appeared to slip something into it.  This individual was wearing a red shirt, red hat, black tennis shoes, red shorts with black and white trim, and later identified himself as Anthony Pierce.

8.    FBI agents also observed an individual matching the description of the bank robbery suspect going in and out of the residence at 405 60th Street N.E. Washington, D.C. at approximately 10:25 a.m.  The individual, who was captured on surveillance video and photos, was described as being approximately 5'8", slender build, and in his 40s. Furthermore, the suspect was wearing light grey shoes with white soles and a large black watch with white border that was similar in appearance to those seen on the robber from the TD Bank surveillance stills.  A closer review of the photos and video taken by FBI surveillance showed that the individual observed at 405 60th Street N.E. Washington, D.C. matched the appearance of both the suspect seen at the TD Bank and also the suspect who robbed the Old Dominion bank, located at 8601 Westwood Center Drive, Vienna, Virginia on June 22, 2017.  As law enforcement surveilled the residence, the suspect entered into a red Volvo station wagon, bearing Virginia license plates VVD-2593, and drove away.  A review of law enforcement databases show that that Virginia license plates VVD-2593 are not registered to a red Volvo station wagon, nor are they registered to the defendant.  Law enforcement followed the vehicle and attempted to make a vehicle car stop; however, the suspect refused to stop the vehicle and drove away at a high rate of speed.  Law enforcement were unable to follow him.

9.    On July 5, 2017, Magistrate Judge Deborah Robinson authorized a search warrant for the premises of 405 60th Street, N.E., Washington, D.C.  On July 5, 2017, at approximately 5:05 p.m., law enforcement executed the search warrant.  This residence is a condemned house in which multiple people are currently residing.  At the time law enforcement entered the residence,

approximately 12 to 15 people were inside, including the owner of the property (hereafter Witness-1). During the search of the residence, law enforcement recovered the following items: (1) a black Under Armour gym bag containing a pair of black glasses, consistent with the bag used to carry money from the robbery as depicted in the surveillance video, found in the living room; (2) a pair of faded black pants, consistent with the pants worn during the robbery as depicted in the surveillance video, on top of the laundry machine; (3) a cell phone that the suspect had used to contact other individuals, and (4) the GPS device from the bank in a storm drain in the front yard of the residence, as described above.

10.     During the course of the search, law enforcement interviewed Witness-1. Witness-1 reported that Dallas, whose first name the owner knew to be Charles, was in the house earlier that day. Witness-1 reported that Dallas had stayed at the residence every other night for the past two weeks and sporadically over the last year. Witness-1 reported that Dallas stayed in the living room, but had belongings in that room as well as in her room. Witness-1 also reported that Dallas was at the residence earlier on July 5, 2017, at around 11:00 or 11:30 a.m. At that time, Dallas ran around the house, ran out to the backyard, and then came back into the residence. Witness-1 reported that Dallas kept peeking out the door and acting in a paranoid manner. Witness-1 also indicated that Dallas had left briefly, but returned later that afternoon. Witness-1 noted that Dallas was 5'7", medium build, and had a groomed beard. Furthermore, he was wearing black jean shorts, grey tank top, light grey shoes, and, at some point that day, he had been wearing a grey hat with a white "smiley face skull" on it. Moreover, Witness-1 showed law enforcement her cellphone, and reported that Dallas had used her cellphone to contact an individual she believed to be Dallas's girlfriend when his phone was not working. Witness-1 further informed law enforcement that she

had been drinking earlier that day, and Witness-1 appeared to be under the influence.  Law enforcement also observed cigarettes, which may have contained marijuana in the residence.

11.     On July 6, 2017, law enforcement interviewed the individual that Dallas contacted on Witness-1's cell phone (hereafter Witness-2).  Witness-2 informed law enforcement that she knew Dallas, whose full legal name she knew to be CHARLES SMOOT.  Witness-2 indicated that she had met SMOOT approximately 6 months ago and that he had recently been had been in contact with her via text message on 202-883-0799, the target telephone.  On the morning of July 5, 2017, SMOOT sent Witness-2 text messages using the target telephone indicating that he need $300 to pay his cellphone bill so that he could talk to her.  Later that day, at approximately 1:30 p.m., Witness-2 indicated that she has received a missed call from SMOOT.  Witness-2 was also shown still photographs from the TD Bank robbery that occurred on July 05, 2017 as well as the Old Dominion Bank robbery that occurred on June 22, 2017.  She indicated that the photos of the TD Bank robbery looked like it could be SMOOT.  However, she was uncertain if the individual illustrated in the Old Dominion Bank photographs was SMOOT due to the picture quality.  Witness-2 also stated that SMOOT had made mentioned of robbing banks in the past, but provided no details to her.

12.     On July 7, 2017, at approximately 9:00 a.m., law enforcement observed SMOOT arrive at Union Station in Washington, D.C.  Following SMOOT's arrest, agents with the Federal Bureau of Investigation were lead to 25 K Street N.E. Washington, D.C. where SMOOT had parked his vehicle.  The vehicle is described as a red Volvo station wagon, bearing Virginia license plates VVD-2593, which is the exact vehicle SMOOT used to evade law enforcement on July 5, 2017.  It was subsequently impounded and towed to FBI Washington Field Office Automotive facility located at 2800 V Street N.E. Washington, D.C., where it remains in the custody of the

FBI.

13.     At the time of his arrest, SMOOT was wearing the same light grey shoes with white soles and a large black watch with white border that was similar in appearance to those seen on the robber from the TD Bank surveillance stills.  SMOOT was later advised of his <u>Miranda</u> rights and agreed to speak with law enforcement.  SMOOT denied participating in either the July 5, 2017, TD Bank robbery or the June 22, 2017, Old Dominion Bank robbery.  SMOOT admitted that he was the individual who drove away from the residence located at 405 60th Street, N.E., Washington, D.C. on the afternoon of July 5, 2017, in the red Volvo.  However, when SMOOT was shown surveillance photographs of himself outside the residence located at 405 60th Street, N.E., he stated he was not sure if that was him.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

14.     As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found in the subject vehicle, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or on other electronic storage media or digital devices.  As used herein, the terms "electronic storage media" and "digital devices" include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog

tapes such as VHS); and security devices.  Thus, the warrant applied for would authorize the seizure of electronic storage media and digital devices or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

*Probable Cause.*  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that if electronic storage media or digital devices are found in the subject premises, there is probable cause to believe that the records and information described in Attachment B will be stored in the electronic storage media and digital devices for at least the following reasons:

a.     Individuals who engage in criminal activities, including criminal conspiracies, use digital devices to communicate with co-conspirators online, but that they also store on computer hard drives and other electronic storage media documents and records relating to their illegal activity.  Online criminals store these documents and records, which can include logs of online "chats" with co-conspirators; email correspondence; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation.

b.      Individuals who engage in the foregoing criminal activity, in the event that they change computers, will often "back up" or transfer files from their old computers' hard drives to that of their new computers, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.      Computer, smart phone, and other digital device files, or remnants of such files, can be recovered months or even years after they have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to an electronic storage medium can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer or a smart phone, the data contained in the file does not actually disappear; rather, that data remains on the electronic storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the electronic storage medium that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from an electronic storage medium depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

*Forensic Evidence.*   As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence or information that establishes how electronic storage media or digital devices were used, the purpose of their use, who used them, and when.   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be on electronic storage media and digital devices in the subject premises because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data on the electronic storage media not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can

reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.    Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, electronic storage media and digital device evidence is not always data that can be merely

reviewed by a review team and passed along to investigators.  Whether data stored on electronic storage media or digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.  Further, in finding evidence of how electronic storage media or a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

    f.  I know that when an individual uses a digital device to engage in criminal activities, including criminal conspiracies, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

    *Methods To Be Used To Search Digital Devices.*  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals, specialized equipment, and software programs necessary to conduct a thorough search.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from electronic storage media also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.  Smart phones capable of storing 64 gigabytes, flash drives capable of storing 128 gigabytes, and desktop computers capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain enormous amounts of data.

15

d.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

e.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are

recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

f.      Analyzing the contents of mobile devices can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application,

allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

g.      Based on all of the foregoing, I respectfully submit that searching any electronic storage media or digital device for the information, records, or evidence subject to seizure pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the media or devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

h.      In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.      Upon securing the subject premises, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any electronic storage media or digital devices, as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review.  For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such electronic storage media or digital devices at the premises.  The electronic storage media and digital devices, and/or any digital images thereof created by law enforcement in aid of the

examination and review, will be examined and reviewed by law enforcement personnel in order to extract and seize the information, records, or evidence described in Attachment B.

2.      The analysis of the contents of any seized electronic storage media or digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.      In searching the seized electronic storage media or digital devices, the forensic examiners may examine as much of the contents of the electronic storage media or digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the seized electronic storage media or digital devices will be specifically chosen to identify only the specific items to be seized under this warrant.

## **CONCLUSION**

WHEREFORE, your Affiant submits that probable cause exists that the red Volvo station wagon, bearing Virginia license plates VVD-2593 and VIN #YV1LW5559T2205235 contains evidence, fruits, and instrumentalities of bank robbery as set forth more fully in Attachment B, in violation of 18 U.S.C. § 2113.

Respectfully submitted,

_____
MICHAEL BROWN
Special Agent, Federal Bureau of Investigation

Subscribed and sworn to before me this _____ of July, 2017.

_____
DEBORAH ROBINSON,
UNITED STATES MAGISTRATE JUDGE